AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
10/23/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ASI _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
OCT 23 2024
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

United States of America,

v.

MANUEL IVAN SANCHEZ,
RICARDO AMEZCUA, and
FERNANDO NAVA,

        Defendants

Case No.  2:24-mj-06453-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

    I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 9, 2023, in the County of Los Angeles in the Central District of California, the

defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to make false statements in records that must be kept by firearms dealers and to deal in firearms without a license |

This criminal complaint is based on these facts:

    *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

_____Special Agent Sean Nicolio,  ATF_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____10/23/2024_____

_____
*Judge's signature*

City and state:  Los Angeles, California

_____Hon. Jacqueline Chooljian, U.S.M.J._____
*Printed name and title*

AUSA:  _Kedar S. Bhatia (x4442)_

## AFFIDAVIT

I, Sean Nicolio, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against Manuel Ivan SANCHEZ, Ricardo AMEZCUA, and Fernando NAVA for violations of 18 U.S.C. § 371 (conspiracy to make false statements in records that must be kept by firearms dealers and to deal in firearms without a license).

2.    This affidavit is also made in support of search warrants for the following:

a.    The premises located at 27978 Rodeo Road, Helendale, California 92342, as described more fully in Attachment A-1 (**"Sanchez Subject Premises-1"**);

b.    The premises located at 421 W. 55th Street, Los Angeles, California 90037, as described more fully in Attachment A-2 (**"Sanchez Subject Premises-2"**);

c.    The red 2023 Chevrolet Silverado bearing Utah License Plate # 9Y4CF and VIN 1GC4YTEY6PF189139, as described more fully in Attachment A-3 (the **"Sanchez Subject Vehicle"**);

d.    The person of SANCHEZ, as described more fully in Attachment A-4;

e.    The premises located at 8961 S. Gate Avenue, South Gate, California 90280, as described more fully in Attachment A-5 (the **"Amezcua Subject Premises"**);

1

f.    The blue 2017 Nissan Sentra bearing California License Plate # 9CHA834 and VIN 3N1AB7AP3HY289544, as described more fully in Attachment A-6 (the "**Amezcua Subject Vehicle**"); and

g.    The person of AMEZCUA, as described more fully in Attachment A-7.

3.    The items to be seized are described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license); § 922(a)(6) (false statements in the sale of a firearm), § 924(a)(1)(a) (false statements in firearms records); § 924(n) (interstate travel to deal in firearms without a license); § 932 (straw purchasing of firearms); § 933 (trafficking of firearms), and § 371 (conspiracy to violate §§ 922(a)(1)(A), 922(a)(6), 924(a)(1)(A), 924(n), 932, 933) (the "Subject Offenses"). Attachments A-1 through A-7, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements

described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. **BACKGROUND OF THE AFFIANT**

5.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed since December 2019. I am a graduate of the Criminal Investigator Training Program and ATF Special Agent Basic Training program held at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received specialized training in the enforcement of federal firearm and explosive laws. My duties and responsibilities include participating in the investigation and prosecution of persons who violate federal firearm laws and related federal criminal laws. As an ATF Special Agent, I have participated in the investigation of persons who have violated federal laws. The majority of these investigations involved firearms and/or narcotics-related violations. I have experience investigating straw purchaser schemes, including those that involve multiple individuals buying and selling firearms. Pursuant to 18 U.S.C. § 3051, I am empowered to enforce criminal laws of the United States. As a result of my training and experience as an ATF Special Agent, I am familiar with federal laws, including but not limited to the offenses listed above.

6.     Prior to my employment by the ATF, I was a Uniformed Division Officer-Technician with the United States Secret Service for approximately 10 years.

### III. **SUMMARY OF PROBABLE CAUSE**

7.    Between November 2022 and July 2024, SANCHEZ, AMEZCUA, and NAVA lived in the Central District of California. Yet, ATF agents have learned that during this period SANCHEZ, AMEZCUA, and NAVA frequently made short trips to Utah to buy firearms from licensed firearms dealers ("FFLs"), and then returned to California to sell those firearms. From Utah-based FFLs, SANCHEZ, AMEZCUA, and NAVA together purchased approximately 42 firearms, including various pistols and semiautomatic rifles.

8.    When SANCHEZ, AMEZCUA, and NAVA bought their guns in Utah, they lied to the dealers. When they purchased firearms, they were required to complete an ATF Form 4473 listing certain information about themselves and making various certifications. Each defendant listed on ATF Form 4473s a residence address in Utah when, in fact, they resided in California. Listing a residence in Utah was important because Utah-based FFLs generally cannot sell firearms to California residents. To accomplish this scheme, each obtained either a driver's license or identification card from the State of Utah listing their false Utah residence addresses. They provided fake documents to the State of Utah to obtain their Utah IDs.

9.    In addition, between in or around January 2023 and in or around August 2023, SANCHEZ purchased approximately eighty-one firearms through an informal, Utah-based online gun exchange. In these transactions, SANCHEZ found individuals listing firearms for sale, messaged those individuals to negotiate a price, and then met

with the individuals in person at various locations throughout Utah. In at least one of the transactions, SANCHEZ coordinated the purchase of the firearm via text message, and AMEZCUA met with the seller to purchase the firearm. SANCHEZ would then advertise the firearms that he purchased for sale to other people at marked-up prices. At no time during the course of this investigation has SANCHEZ, AMEZCUA, or NAVA possessed a license to deal firearms.

10.  This affidavit is also submitted in support of requests to search two residences where SANCHEZ frequently stays, SANCHEZ's vehicle, AMEZCUA's residence and vehicle, and the persons of SANCHEZ and AMEZCUA. For the reasons set forth below, I believe evidence and instrumentalities of the Subject Offenses will be found in a search of those locations, vehicles, and persons.

### IV. **STATEMENT OF PROBABLE CAUSE**

A.  <u>Training And Experience Regarding Firearms Transactions</u>

11.  Based on my training and experience, I know the following about the requirements and forms for purchasing a firearm from an FFL:

a.  When a person purchases a firearm from a FFL, that individual must fill out an ATF Form 4473. This form is the official transfer record that documents the transfer of the purchased firearm(s) from the FFL to purchaser. When a purchaser fills out the form, the purchaser must provide personal information and answer a series of questions that are designed to determine if the purchaser is buying the firearms for himself/herself and if the purchaser is a

5

prohibited possessor. The dealer fills out a portion of the form as well, which includes the make, model, and serial number of the firearm(s) being purchased. If a purchaser buys two or more handguns in a five-day period, the FFL must send a Multiple Sale Report to ATF. On the Multiple Sale Report, the FFL must provide ATF with the name, date of birth, address, other personal identifiers of the purchaser, and the firearms purchased by the purchaser. ATF SAs have access to the database where Multiple Sale Report information is stored.

b.    As a general matter and subject to certain exceptions, FFLs are only permitted to sell firearms to residents of the state in which the FFL's licensed premises is located. *See* 18 U.S.C. § 922(b)(3); 27 C.F.R. § 478.99(a).[1]

c.    Section A of ATF Form 4473 asks for the purchaser's name, date of birth, current address, and other personal identifiers. The purchaser must also answer a series of questions designed to determine if that person is a prohibited

---

[1] An exception to this rule applies if an FFL sells a rifle or shotgun to a person who is not a resident of the state where the FFL's business premises is located, provided the transaction complies with state law in the state where the FFL is located and in the state where the purchaser resides. The sales described below in Utah would not be lawful in California for several reasons. For example, the FFL did not follow California's 10-day waiting period for firearms and the FFL did not have California-state licenses. *See* Cal. Pen. Code §§ 26815 (imposing 10-day waiting period for firearms), 26700 (listing California licensing requirements).

possessor. Section A also requires the purchaser to certify the following:

> I certify that my answers are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal Law, and may also violate State and/or local law. I also understand that making any false oral or written statements, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal Law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal Firearms License is a violation of Federal law.

Below that certification, the purchaser must sign and date the Form.

d.    The amount of time between when a firearm is first purchased at a licensee or gun store and when it is recovered by law enforcement is referred to as the firearm's "time-to-crime." If an individual purchases one or more firearms with a short time-to-crime, or recovery time, that may be indicative of the person not being a bona fide purchaser and instead being a straw purchaser.

e.    In addition, individuals with prior felony convictions are not permitted to purchase firearms through common lawful means and are generally prohibited from possession firearms, so they must resort to unlawful means to acquire firearms. One of those unlawful means is paying a straw purchaser to buy a firearm on their behalf or paying an individual who already purchased a firearm knowing that they would resell it to prohibited persons.

7

B.    SANCHEZ, AMEZCUA, And NAVA Purchase A Large Volume Of
Firearms In Utah

12.    As set forth below, records obtained by ATF show that
SANCHEZ, AMEZCUA, and NAVA have purchased a large volume of firearms
in Utah. In forms related to these purchases, SANCHEZ, AMEZCUA, and
NAVA lied about their residences, saying they lived in Utah despite
actually living in California. Text messages show defendants
messaged about the false addresses that they used and ways of
getting a Utah ID that would show the false addresses.

i.    Overview Of Purchases By The Defendants

13.    Based on my review of ATF Form 4473s and Multiple Sale
Reports, I have learned, among other things, that between November
2022 and July 2024, SANCHEZ, AMEZCUA, and NAVA collectively
purchased at least forty-two firearms from Utah FFLs. Specifically,
I have learned the following:

a.    ATF Form 4473s and Multiple Sale Reports show that
SANCHEZ purchased 25 firearms between November 2022 and July 2023.
In each of these transactions, SANCHEZ listed his residence as 3282
W 9000 SOUTH, WEST JORDAN, UT (the "West Jordan Address"). Records
accompanying the ATF Form 4473 from a purchase on April 4, 2023,
show that SANCHEZ provided a Utah Identification card listing this
address and an image of himself (the "Sanchez Utah ID"), which
matches SANCHEZ's appearance in a California driver's license
photograph:

8



*SANCHEZ's Utah Identification Card*



*SANCHEZ's California Driver's License Photograph*

b.    ATF Form 4473s and Multiple Sale Reports show that AMEZCUA purchased 8 firearms between May 2023 and July 2023. In each of these transactions, AMEZCUA listed his residence as 3517 S 1200 E, Millcreek, Utah 84106 (the "Millcreek Address"). Records accompanying the ATF Form 4473 from a purchase on May 16, 2024, show that AMEZCUA provided a Utah Identification card listing this address and an image of himself (the "Amezcua Utah ID"), which matches AMEZCUA's appearance in a California driver's license photograph:



*A Portion of AMEZCUA's Utah Identification Card*



*AMEZCUA's California Driver's License Photograph*

    c.    ATF Form 4473s and Multiple Sale Reports show that NAVA purchased 11 firearms between May 2023 and August 2023. Six of these purchases were for FN Model M249 5.56 caliber rifles. In each of these transactions, NAVA listed his residence as 3517 S 1200 E, South Salt Lake, Utah 84106, *i.e.*, the Millcreek Address[2] and the same address AMEZCUA listed on the Amezcua Utah ID. Records

---

[2] AMEZCUA and NAVA both frequently list the same street address (3517 S 1200 E) and list the same state (Utah) and zip code (84106). In the rental contracts they submitted to the State of Utah, AMEZCUA listed the landlord as "Manuel Sanchez" and NAVA listed the landlord as "Michael Sanchez." However, AMEZCUA lists the city as "Millcreek" and NAVA lists the city as "South Salt Lake" or "South Salt Lake City." Based on my training and experience and my review of publicly available map records, I believe both of these listed addresses relate to the same purported address in Millcreek, *i.e.*, the Millcreek Address.

accompanying the ATF Form 4473 from a purchase on July 19, 2023, show that NAVA provided a Utah Identification card listing this address and an image of himself (the "Nava Utah ID"), which is consistent with NAVA's appearance in a California driver's license photograph:



*NAVA's Utah Identification Card*



*NAVA's California Driver's License Photograph*

ii.  Examples Of Purchases By The Defendants

14.  Below are several examples of firearms purchases by defendants in furtherance of the Target Offenses.

May 16, 2023 Purchase (AMEZCUA)

15.  Based on my review of reports, my communications with other law enforcement officers, and my involvement in this investigation, I have learned, among other things, that in or about July 2023, ATF received information from an FFL in St. George, Utah, regarding a suspicious transaction that had occurred earlier, on May

11

16, 2023. The FFL reported that AMEZCUA was purchasing a high
caliber firearm in cash. According to the ATF Form 4473 completed as
part of that transaction, AMEZCUA purchased a Fabrique Nationale
("FN") model M249, 5.56 caliber, rifle for $11,001.68. AMEZCUA
provided a Utah temporary identification card with ID No. 241766674
*i.e.*, the Amezcua Utah ID, which listed the Millcreek Address.
According to the issuance date listed on the Amezcua Utah ID,
AMEZCUA obtained the Amezcua Utah ID on May 16, 2023, the same day
he purchased the rifle. During the firearm transaction with the FFL,
AMEZCUA provided a particular phone number ending in 9671 as his
phone number (the "Amezcua Phone Number").

16. On or about August 25, 2023, the Hon. Dustin B. Pead,
Chief United States Magistrate Judge, United States District Court
for the District of Utah, authorized a warrant for agents to collect
cellphone location data for the Amezcua Phone Number. Specifically,
the warrant authorized agents to collected historical data from
March 1, 2023, to August 25, 2023, and prospective data from August
25, 2023, to September 24, 2023. *See* Nos. 2:23-mj-790, 2:23-mj-791
(D. Utah).

17. Based on my review of a report by a law enforcement
analyst who analyzed cellphone location data for the Amezcua Phone
Number obtained pursuant to the warrants described above, I have
learned, among other things, that on or about May 16, 2023, multiple
cell site transactions were indicative of travel originating in
South Gate, California, at 8:20 a.m., with travel continuing

northbound through Barstow, California, Las Vegas, Nevada, and
Mesquite, Nevada. AMEZCUA then spent approximately 2.5 hours in St.
George, Utah, often within cell-site radius of the FFL from which he
purchased the firearm. AMEZCUA then returned to South Gate,
California - the vicinity of the **Amezcua Subject Premises** - by May
17, 2023, at approximately 8:52 a.m.

### May 24, 2023 Purchases (SANCHEZ, AMEZCUA, and NAVA)

18.   As set forth below, on or about May 24, 2023, NAVA
purchased a firearm from a particular store in Sandy, Utah. Shortly
thereafter, AMEZCUA purchased a firearm from the same store. Records
also show that SANCHEZ purchased a firearm from the same store on
that day.

19.   Based on my review of ATF Form 4473s and accompanying
records, I have learned, among other things, the following:

        a.   On or about May 24, 2023, NAVA purchased an FN model
249s PARA rifle from a particular FFL in Sandy, Utah ("FFL-1").
According to the sales receipt provided by FFL-1, the transaction
took place at or about 2:56 p.m.[3] In purchasing the firearm, NAVA
provided the Nava Utah ID.

        b.   On or about May 24, 2023, AMEZCUA purchased an FN
model M249S rifle from FFL-1, where NAVA purchased a similar firearm
the same day. According to the sales receipt provided by FFL-1, the

---

[3] All times referenced in this affidavit are in Mountain Time, unless
otherwise noted.

transaction took place at or about 5:33 pm, *i.e.*, approximately 2.5 hours after NAVA's purchase. In purchasing the firearm, AMEZCUA provided the Amezcua Utah ID.

      c.   On or about May 24, 2023, SANCHEZ purchased two Beretta USA model APX 9mm pistols from FFL-1. In purchasing the firearms, SANCHEZ provided the Sanchez Utah ID. Records provided to the ATF do not show what time on that day SANCHEZ purchased his pistols.

      20.  As set forth below, law enforcement officers later seized a cellphone belonging to NAVA and searched it pursuant to a federal search warrant. Based on my review of the contents of that cellphone, I know that AMEZCUA, using the Amezcua Phone Number, and NAVA, using a particular phone number ending in 7805 (the "NAVA Phone Number"), had the following text message exchange:

           AMEZCUA: "FN m249"

           AMEZCUA: "Paratrooper"

           NAVA: "is it upstair?"

           AMEZCUA: "Gun section"

Based on my training and experience, the conversation above reflects AMEZCUA and NAVA discussing the purchase of FN model M249 rifles from FFL-1. AMEZCUA appears to be instructing NAVA on what gun to buy ("FN 249" and "Paratrooper"). NAVA then asks where to buy the gun in the FFL-1 store ("is it upstair[s]?"), and then AMEZCUA confirms where to buy the gun in the store ("Gun section").

21.    License-plate reader ("LPR") records shows that a vehicle registered to AMEZCUA traveled from California to Utah for a short trip, which, based on my training and experience, is consistent with a trip in furtherance of the Subject Offenses. Specifically, based on my review of LPR records and vehicle registration records, I have learned, among other things, the following:

a.    On May 23, 2023, at approximately 12:52 a.m., there was a LPR capture of a particular blue Nissan Sentra with California license plate 9CHA834, *i.e.*, the **Amezcua Subject Vehicle**, which vehicle registration records show was registered to AMEZCUA and another individual.[4] The LPR capture showed the **Amezcua Subject Vehicle** traveling northbound on I-15 near the border of California and Nevada, *i.e.*, it was traveling from California to Nevada. Based on my training and experience and my review of map records, I believe this path along I-15 is a typical route from Los Angeles, California, to various locations in Utah.

b.    As set forth above, AMEZCUA and NAVA purchased firearms from FFL-1 in Utah on May 24, 2023.

---

[4] As set forth herein, the **Amezcua Subject Vehicle** is registered to AMEZCUA and another person, and the **Sanchez Subject Vehicle** is registered to SANCHEZ and another person. Based on my training and experience, I know that vehicles are often registered to spouses or family members. The vehicles may therefore be used by both registered owners and contain records belonging to both people. Given AMEZCUA's and SANCHEZ's use of their vehicles, as set forth herein, I believe the vehicles may contain evidence of their unlawful activities, even if the vehicles were also used by their family members.

15

   c. On May 25, 2023, at approximately 12:23 a.m., there was a LPR capture of the AMEZCUA's Vehicle going southbound on I-15 near the border of California and Nevada, *i.e.*, it was traveling from Nevada to California. Based on my training and experience and my review of map records, I believe this path along I-15 is a typical route from Sandy to Los Angeles.[5]

  22. Based on my review of a report by a law enforcement analyst who analyzed cellphone location data for the Amezcua Phone Number obtained pursuant to the warrants described above, I have learned, among other things, that multiple cell site transactions on or about May 24, 2023, are indicative of travel originating in South Gate, California, at 6:31 p.m., with travel continuing northbound through Primm, Nevada, and St. George, Utah. AMEZCUA then spent approximately 8 hours in the Salt Lake Valley, Utah, which is an area that contains the location of FFL-1. AMEZCUA then returned to South Gate, California on May 25, 2023, at approximately 8:52 a.m.

  23. Call records show that SANCHEZ, AMEZCUA, and NAVA were communicating during this period using the **Subject Telephones**.

---

[5] Based on my review of ATF Form 4473s, I have learned, among other things, that on or about May 25, 2024, SANCHEZ purchased two more pistols from an FFL in Farmington, Utah. In purchasing the firearms, SANCHEZ provided the Sanchez Utah ID. Accordingly, while I believe SANCHEZ purchasing firearms together with AMEZCUA and NAVA in furtherance of the Subject Offenses, I believe he did not return to California with AMEZCUA and NAVA in the early morning hours of May 25, 2024.

Specifically, based on my review of call records, I have learned, among other things, the following:

      a.   From May 23, 2023, to May 25, 2023, there were a total of 31 phone contacts, *i.e.*, calls or text messages, between a particular phone number ending in 5608 (the "Sanchez Phone Number")[6] and the Amezcua Phone Number.

      b.   From May 23, 2023, to May 25, 2023, there were a total of 16 phone contacts between the Sanchez Phone Number and the NAVA Phone Number.

<u>June 27-28, 2023 Purchases (SANCHEZ, AMEZCUA, and NAVA)</u>

24.   Based on my review of ATF Form 4473s, Multiple Sale Reports, and records obtained from FFLs, I have learned, among other things, the following:

      a.   On June 27, 2023, AMEZCUA purchased one FN model SCAR rifle from FFL-1, where SANCHEZ, AMEZCUA, and NAVA had previously all purchased firearms. The same day, SANCHEZ purchased a Beretta 9mm pistol from FFL-1. Also on the same day, June 27, 2023, NAVA purchased the same type of firearm purchase by AMEZCUA, an FN model SCAR rifle, from FFL-1.

---

[6] Based on my review of T-Mobile records obtained in or about October 2024, I have learned, among other things, that the Sanchez Phone Number is subscribed to "Ivan Security," and has been subscribed to that account since on or about April 14, 2019. Based on my review of law enforcement records, I know that SANCHEZ's full name is "Manual Ivan Sanchez," so I believe "Ivan Security" may be a reference to SANCHEZ's middle name. The service and billing addresses for Sanchez Phone Number are 3282 West 9000 South, West Jordan, UT 84088.

b.    On June 28, 2023, AMEZCUA purchased one Springfield Hellcat 9mm pistol from FFL-1. The same day, NAVA purchased two FN model M249S rifles from an FFL in Riverdale, Utah,[7] and two Beretta model APX 9mm pistols from an FFL Lehi, Utah ("FFL-2"). The same day, SANCHEZ purchased two Beretta model APX 9mm pistols, *i.e.*, the same type of firearm purchased by NAVA, from FFL-2.

c.    Surveillance video obtained from FFL-2 shows SANCHEZ, AMEZCUA, and NAVA together in the store, based a comparison of the video to driver's license photos of each individual:



*Photograph of SANCHEZ and AMEZCUA*



*Photograph of AMEZCUA and NAVA*

---

[7] Based on my review of an ATF Form 4473, during the transaction with the Sportsman's Warehouse in Riverdale, Utah, NAVA provided the NAVA Phone Number as his phone number.

25.    LPR information shows that a vehicle registered to SANCHEZ traveled from California to Utah for a short trip, which, based on my training and experience, is consistent with a trip in furtherance of the Subject Offenses. Specifically, based on my review of LPR records and vehicle registration records, I have learned, among other things, the following:

a.    On or about June 27, 2023, at approximately 12:56 p.m., there was a LPR capture of a particular red 2023 Chevrolet Silverado bearing Utah License Plate # 9Y4CF, which vehicle registration records show was registered to SANCHEZ and another individual, *i.e.*, the **Sanchez Subject Vehicle**. The LPR capture showed the **Sanchez Subject Vehicle** traveling northbound on I-15 near the border of California and Nevada, *i.e.*, it was traveling from California to Nevada.

b.    As set forth above, SANCHEZ, AMEZCUA, and NAVA purchased firearms – often together or from the same location – on or about June 27 and 28, 2023.

c.    On June 29, 2023, at approximately 12:52 a.m., there was a LPR capture of the **Sanchez Subject Vehicle** going southbound I-15 near the border of California and Nevada, *i.e.*, it was traveling from Nevada to California.

26.    Call records show that SANCHEZ, AMEZCUA, and NAVA were communicating during this period. Specifically, based on my review of call records, I have learned, among other things, the following:

   a. From June 26, 2023, to June 29, 2023, there were a total of approximately 84 phone contacts between the Sanchez Phone Number and the Amezcua Phone Number.

   b. From June 26, 2023, to June 29, 2023, there were a total of approximately 26 phone contacts between the Amezcua Phone Number and the Nava Phone Number.

<u>July 9, 2023 Purchases (AMEZCUA)</u>

27. Based on my review of ATF Form 4473s and Multiple Sale Reports, I know among other things, that on or about on July 9, 2023, AMEZCUA purchased three pistols from an FFL in St. George, Utah ("FFL-3"). One of the firearms purchased in this transaction was a Taurus model G2S 9mm caliber pistol (the "July 9 Firearm").

28. LPR records show that AMEZCUA was driving from California to Utah early in the morning on the same day as the purchase above, and LPR records show his vehicle was back in California a few days later. Specifically, based on my review of LPR records and records provided by an FFL, I have learned, among other things, the following:

   a. On or about July 9, 2023, at approximately 1:07 a.m., an LPR captured the **Amezcua Subject Vehicle** driving northbound near the California and Nevada border.

   b. As set forth above, on or about July 9, 2023, AMEZCUA purchased three firearms from FFL-3. A receipt provided by the FFL shows that the transaction took place at approximately 1:33 p.m.

c.    On or about July 12, 2023, an LPR captured the **Amezcua Subject Vehicle** in the vicinity of Huntington Park, California, which is in Los Angeles County.

29.    Based on my review of a report by a law enforcement analyst who analyzed cellphone location data for the Amezcua Phone Number obtained pursuant to the warrants described above, I have learned, among other things, multiple cell site transactions on or about July 9, 2023, are indicative of travel originating in South Gate, California, at 8:44 p.m., with travel continuing northbound through Barstow, California. A cell-site transaction showed AMEZCUA being in St. George, Utah, at 1:35 p.m. within the cell-site radius of the FFL where he purchased the firearms. AMEZCUA then traveled back southbound through Las Vegas, Nevada and returned to South Gate, California, on July 10, 2023, at approximately 11:34 a.m.

30.    Based on my training and experience, AMEZCUA's short trip to Utah, where he listed a false address on ATF forms, is consistent with a trip in furtherance of the Subject Offenses, rather than a bona fide purchase. Furthermore, for the reasons set forth herein and described in more detail below, I believe it is further evidence that AMEZCUA is not a resident of Utah, contrary to his representations to FFLs and to the State of Utah.

31.    Based on my review of Los Angeles Police Department ("LAPD") records, I have learned, among other things, that on or about September 9, 2023, LAPD officers arrested a particular individual ("Individual-1") in Los Angeles, California, in

21

possession of the July 9 Firearm. Individual-1 had prior felony convictions so, based on my training and experience, it was unlawful for him to possess the July 9 Firearm and it would have been unlawful for him to purchase the firearm himself from an FFL. The time-to-crime between AMEZCUA buying the firearm and Sanchez being found with it was 55 days. Based on ATF records, when Individual-1 was arrested in possession of the July 9 Firearm, AMEZCUA was still the last registered owner of the firearm in ATF records. Based on my training and experience, this is consistent with AMEZCUA acting as a straw purchaser and delivering the firearm to Individual-1 who, as a felon, was prohibited from most avenues for lawfully purchasing a firearm. Based on my training and experience, AMEZCUA may also have unlawfully transferred the firearm to an intermediary or broker who then provided the firearm to Individual-1.

### July 15, 2023 Attempted Purchase (AMEZCUA)

32. As set forth below, in July 2023, AMEZCUA made a trip to Utah to buy a firearm, but was unsuccessful when the store did not have the firearm he wanted. However, notably, video surveillance shows that AMEZCUA made the trip to Utah in the **Sanchez Subject Vehicle**, demonstrating coordination between AMEZCUA and SANCHEZ towards the Subject Offenses.

33. On July 15, 2023, an FFL-3 compliance officer contacted me and informed me that AMEZCUA visited FFL-3 in St. George, Utah, to purchase an FN model M249S rifle with $10,000 dollars in cash. The compliance officer informed me that FFL-3 did not have any FN M249S

22

rifles in stock and AMEZCUA came in and placed an order to buy it at a later date.

34.   According to the surveillance video provided by FFL-3, on July 15, 2023, AMEZCUA was seen in the parking lot of the store exiting the **Sanchez Subject Vehicle** from the passenger side.

35.   LPR information shows that the **Sanchez Subject Vehicle** traveled from California to Utah for a short trip, which, based on my training and experience, is consistent with a trip in furtherance of the Subject Offenses. Specifically, based on my review of LPR records and vehicle registration records, I have learned, among other things, the following:

a.   On or about July 15, 2023, at approximately 4:22 a.m., there was a LPR capture of the **Sanchez Subject Vehicle** traveling northbound on I-15 near the border of California and Nevada, *i.e.*, it was traveling from California to Nevada.

b.   As set forth above, on July 15, 2023, AMEZCUA attempted to purchase a firearm after getting out of the SA **Sanchez Subject Vehicle.**

c.   On July 16, 2023, at approximately 2:22 a.m., there was a LPR capture of the **Sanchez Subject Vehicle** going southbound I-15 near the border of California and Nevada, *i.e.*, it was traveling from Nevada to California.

C.    <u>SANCHEZ And NAVA Are Detained In August 2023 And Their</u>
      <u>Phones Are Searched Pursuant To A Federal Search Warrant</u>

36.    Based on my communications with other law enforcement
officers, my review of law enforcement reports, and my personal
observations, I have learned, among other things, the following:

a.    On or about August 8, 2023, the ATF received
information from FFL-1 that NAVA was scheduled to pick up firearms
from FFL-1 the next day.

b.    On or about August 9, 2023, the ATF was notified that
there was an LPR capture of the **Sanchez Subject Vehicle** at
approximately 1:51 a.m. traveling northbound on I-15 near the
California and Nevada border.

c.    Later that day, on or about August 9, 2023, at
approximately 9:52 a.m., the ATF obtained information from FFL-1
that NAVA was at FFL-1 attempting to purchase firearms. Once ATF
agents learned that NAVA was there, they went to FFL-1 to conduct
surveillance. Through surveillance cameras, agents were able to
identify that NAVA was dropped off at FFL-1 by a 2021 GMC Yukon
bearing Colorado license plate #AGYV35 (the "Rental Vehicle").
Vehicle registration records showed that the Rental Vehicle was
registered as to a particular rental car company. Agents observed
NAVA exit the front passenger seat of the Rental Vehicle and enter
FFL-1. While NAVA was in the store, agents observed that SANCHEZ was
the driver of the Rental Car.

    d.    According to a receipt provided by FFL-1, NAVA purchased the following three firearms on August 9, 2023:

            i.    An FN model SCAR 17 NRCH, caliber 7.62 rifle;

            ii.    An FN model M249S Para, caliber 5.56 rifle; and

            iii.  A Springfield model XD, caliber 40S&W pistol.

    e.    The purchase of these three firearms totaled $15,397.84.

    f.    As NAVA was walking out of FFL-1, law enforcement officers detained NAVA. Around the same time, officers detained SANCHEZ, who was in the driver's seat of the Rental Vehicle.

    g.    After SANCHEZ and NAVA were detained, law enforcement officers asked SANCHEZ and NAVA if they wanted law enforcement to retrieve their property from the Rental Vehicle prior to it being impounded. Both NAVA and SANCHEZ agreed. When SANCHEZ agreed for law enforcement to grab his property from the Rental Vehicle, SANCHEZ uttered that a firearm was in his bag located in the back seat. Law enforcement recovered the firearm, which was a Springfield Armory, model 911 .380 caliber pistol with a loaded magazine.

    h.    Law enforcement officers recovered from inside the Rental Vehicle two cellphones from the center console area: one Samsung cellphone with IMEI 354685320531056 ("Sanchez Phone 1") and another Samsung cellphone with IMEI 357299882952879 ("Sanchez Phone

2"). Officers also recovered one cellphone from NAVA's person, a Samsung cellphone with IMEI 355464113026529 (the "Nava Phone").[8]

D.    Communications On SANCHEZ's And NAVA's Phones Show Evidence Of The Target Offenses

37.    On or about August 10, 2023, the Hon. Celia M. Romero, United States Magistrate Judge, United States District Court for the District of Utah, authorized warrants to search Sanchez Phone 1 and the Nava Phone. See Nos. 2:23-mj-736, 2:23-mj-737 (D. Utah). On or about August 16, 2023, the Hon. Jared C. Bennett, United States Magistrate Judge, United States District Court for the District of Utah, authorized a warrant to search Sanchez Phone 2. See No. 2:23-mj-761 (D. Utah)

38.    As set forth below, a review of Sanchez Phone 1, Sanchez Phone 2, and the NAVA Phone showed that SANCHEZ, AMEZCUA, and NAVA were engaged in the Subject Offenses.

---

[8] Based on my personal observations and my review of law enforcement records, I know that, after being detained, NAVA was advised of his *Miranda* rights and agreed to speak to officers. Among other things, he stated he purchased 4-5 FN M249s rifles, 3-4 FN SCARS rifles, and then a couple other firearms. NAVA stated that he purchased approximately 10-12 firearms total. NAVA claimed he was buying the M249S rifles because there was a chance they would significantly increase in value in the future. NAVA claimed all of the firearms he purchased were being stored at a location in Utah but declined to disclose the location. When asked what caliber the FN SCAR 17 rifle was, which he purchased at FFL-1 during the interdiction, he stated he did not know. NAVA stated he works private car sales in Utah and for a car sales company in California.

i.   <u>Sanchez Phone 1</u>

39.   Based on my review of Sanchez Phone 1 and a law enforcement report describing the contents of Sanchez Phone 1, I have learned, among other things, the following:

a.   Sanchez Phone 1 showed photographs of SANCHEZ posing with firearms and displaying other firearms. For example:

 

*Photograph of SANCHEZ posing with a firearm*

*Photograph of several firearms displayed together*

b.   Communications on Sanchez Phone 1 show SANCHEZ engaging in frequent purchases and sales of firearms. For example, on or about January 18, 2023, SANCHEZ had the following conversation with an individual who was using a particular phone number ending in 5185 ("CC-1"), in which SANCHEZ is complaining about a buyer who backed out of a firearm sale:

CC-1:        Your selling one?

SANCHEZ:     Simon cuz.

27

SANCHEZ:        The guy ranked it on me

SANCHEZ:        Well, technically he's going to be stuck
                with it because he already paid me in
                advance, but he changed his mind
                afterwards because he thought it was a
                308. But it is a 6.5 creedmoor

SANCHEZ:        Which I told him ahead of time it was 6.5
                creedmoor

CC-1:           Damn that's brutal cuz. That's alot of
                money to be stuck with something. And yea
                6.5 fuckin expensive and harder to find.

CC-1:           So you have it with you?

CC-1:           You got it at a store or off the exchange

SANCHEZ:        In other states but not here. It's pretty
                much the same price as 308

SANCHEZ:        I was just at [FFL-1] and actually I
                found this website that sells ammo pretty
                cheap

SANCHEZ:        Yeah I have it with me

SANCHEZ:        Honestly if I had the money I would keep
                it because it is a good deal and
                regardless I'm keeping the difference
                which I'm not charging you but I'm
                charging him if you get what I mean

| SANCHEZ: | I'm giving it to you at the price I got it for. I charged him 4700 because it cost 4300-4900 in the store |
|---|---|
| SANCHEZ: | I'm going to talk to him and see if he wants to take a loss on it and knock off a little more on his end |
| SANCHEZ: | If not, like I said and he already knows he would be stuck with it because I let him know everything in advance. He already paid me so he knows it is on him |
| SANCHEZ: | You should think about it cuz. you could end up reselling it for more. And I'm about to give you 600 for the glock so you won't have to shell out as much |

Based on my training and experience, the conversation above reflects SANCHEZ discussing selling a firearm ("6.5 creedmoor") to a person who thought they were buying a different type of firearm ("308"). SANCHEZ also discusses buying a firearm from CC-1 ("I'm about to give you 600 for the glock").

c.    The Amezcua Phone Number was saved in Sanchez Phone 1 under a contact labeled "Rick," which I believe may be a reference to AMEZCUA's first name, "Ricardo."

d.    On or about October 1, 2022, SANCHEZ messaged AMEZCUA, using the Amezcua Phone Number, saying "Also try to sell the ARs for me please even if you don't make much. I'm not making

29

much myself I just need to get rid of em to pay these bills." Based on my training and experience, this conversation reflects SANCHEZ asking AMEZCUA to sell AR-style firearms on his behalf ("try to sell the ARs for me") because SANCHEZ was in need of money.

       e.   On or about March 26, 2023, SANCHEZ had the following conversation with AMEZCUA, using the Amezcua Phone Number:

     AMEZCUA:  Do you still have the ar

     SANCHEZ:  Yeah

     AMEZCUA:  Bring it yea ima show a dude

Based on my training and experience, I believe the conversation above reflects AMEZCUA asking SANCHEZ if he has an AR-style firearm to sell ("the ar" to "show a dude") and SANCHEZ responds that he has the firearm.

       ii.  <u>Sanchez Phone 2</u>

    40.  As described further below, Sanchez Phone 2 contained many messages between SANCHEZ and others about the scheme to buy guns in private transactions and flip them for higher prices. However, the phone did have some messages in furtherance of the scheme to make false statements to dealers. For example, one exchange took place on May 16, 2023, when SANCHEZ, using Sanchez Phone 2, messaged AMEZCUA to give him the instructions on the records needed to apply for a State of Utah identification card.

iii. <u>The Nava Phone</u>

41.    Based on my review of the Nava Phone and a law enforcement report describing the contents of the Nava Phone, I have learned, among other things, the following:

a.    The Amezcua Phone Number was saved in the Nava Phone under a contact labeled "RICARDO AMEZCUA Stg."

b.    On or about May 8, 2023, NAVA had the following conversation with the AMEZCUA, who was using the Amezcua Phone Number:

NAVA:      Good morning bro did you get the address?

AMEZCUA:   [*AMEZUCA sent a screenshot of a mailing address that listed 3517 S 1200 E, Millcreek, UT 84106-2425*]

AMEZCUA:   3569 perritz better it's my brother address

AMEZCUA:   3569 S 1200 East Millcreek UT 84106

NAVA:      Like this? 3569 S 1200 E Millcreek Utah 84106-2425

AMEZCUA:   Wait let me Make sure

AMEZCUA:   Ok Gucci

Based on my training and experience, the conversation above reflects AMEZCUA instructing NAVA on what fake address to use. As set forth below, NAVA changed the address on his credit card statement to show an address in Utah where he did not really live, and he then submitted a credit card statement as purported "proof" of his Utah address.

    c.   On or about May 9, 2023, NAVA sent the following message to AMEZCUA, who was using the Amezcua Phone Number: "So I checked the credit card statement and it still has the old address but the app has the Utah address."

    d.   On or about May 17, 2023, NAVA had the following conversation with the AMEZCUA, who was using the Amezcua Phone Number:

> AMEZCUA:  Hey, what's up big dog just checking in I saw the big guys today everything's all set up. We should be good to go pehrinz
>
> AMEZCUA:  I got everything I'm on it I wanna see how we're going to maximize for you OK?
>
> NAVA:     Sounds good bro I'm ready…thanks a lot

Based on my training and experience, the conversation above reflects AMEZCUA preparing NAVA for a trip to Utah to purchase firearms after AMEZCUA "saw the big guys today." AMEZCUA then told NAVA that he wants to "maximize for you," meaning he wants to make the trip as lucrative as possible for NAVA. As set forth above, on or about May 24, 2023, SANCHEZ, AMEZCUA, and NAVA did, indeed, all buy firearms at FFL-1.

    e.   On or about May 23, 2023, NAVA had the following conversation with AMEZCUA, who was using the Amezcua Phone Number:

> AMEZCUA:  Passport or birth certificate Actual Social Security card debit card (not overdrafted) credit card statement with the new address

NAVA:        I only got .80 on my debit card bro but the

rest is good

AMEZCUA:    lol Ok

Based on my training and experience and my involvement in this
investigation, I believe the conversation above reflects AMEZCUA
telling NAVA what documents he needs to bring in order to get a Utah
ID.

42.    As set forth above, on or about May 23, 2024, the **Amezcua
Subject Vehicle** traveled from California en route to Utah. On or
about May 24, 2024, AMEZCUA messaged NAVA, explaining that the "FN
m249 . . . Paratrooper" was in the "gun section." The same day, ATF
Form 4473 records show that NAVA purchased an FN model M249
Paratrooper rifle from FFL-1, providing the Millcreek Address as his
own and the Nava Utah ID. On or about May 25, 2024, LPR records show
that the **Amezcua Subject Vehicle** returned to California.

43.    Based on my review of the Nava Phone and law enforcement
reports describing the contents of the Nava Phone, I have learned,
among other things, that on or about July 18, 2023, NAVA messaged
AMEZCUA, who was using the Amezcua Phone Number, several times about
logistics for another trip to Utah. After AMEZCUA did not respond to
several messages, AMEZCUA eventually responded "Get everything ready
we still on" and "Everything full speed ahead. Y'all leaving
tonight." NAVA responded by saying "Nah I need you to call me you
know I don't work like this you told me you were going to
quarterback the situation and I'm not getting any details on the

33

play so please call me or I'll call you from [a particular co-conspirator's] phone." AMEZCUA responded that NAVA should call from the co-conspirator's phone. As set forth above, on or about July 18, 2023, AMEZCUA purchased a firearm an FN model M249S from FFL-1 and, the next day, on July 19, 2023, NAVA purchased an FN model M249S rifle from an FFL in St. George, Utah.

E.    SANCHEZ, AMEZCUA, And NAVA Lied About Their Residence

44.    As set forth below, ATF's investigation has revealed that SANCHEZ, AMEZCUA, and NAVA lied about being Utah residents because, in fact, they lived in California. They typically obtained their Utah-issued identification cards within days of their first firearms purchase. They also obtained their identification cards by providing fake documents to the State of Utah. In addition, in many instances, license-plate reader data shows that they drove vehicles from California to Utah, purchased one or more firearms in Utah, and then returned home soon thereafter.

i.    SANCHEZ, AMEZCUA, And NAVA Obtain Utah-Issued Identification Cards

45.    Based on my review of records from the State of Utah and publicly available information, I have learned, among other things, the following:

34

   a. In order to obtain a State of Utah identification card, an individual must provide documents establishing that the individual resides in Utah.[9]

   b. SANCHEZ obtained the Sanchez Utah ID on or about November 15, 2022. In his application for a Utah license, SANCHEZ represented that his Utah home address was the West Jordan Address. In support of his application, SANCHEZ submitted three documents:

    i. A "Utah Residential Lease Agreement" listing a particular co-conspirator as his landlord ("CC-2")[10] and stating that SANCHEZ had entered a lease at the West Jordan Address for the period from November 1, 2022, to November 1, 2023;

    ii. The first page of a J.P. Morgan Chase Bank account statement purportedly addressed to SANCHEZ at the West Jordan Address; and

    iii. An image of SANCHEZ's Social Security card, dated November 1, 2022, *i.e.*, weeks before SANCHEZ applied for a Utah identification card.

   c. AMEZCUA obtained the Amezcua Utah ID on or about May 16, 2023. In his application for a Utah ID, AMEZCUA represented that

---

[9] *See Required Documents To Obtain A Utah License Or Identification Card*, Utah Dept. of Public Safety, Driver License Division, https://dld.utah.gov/wp-content/uploads/sites/17/2023/04/DLD-335-English-REV-4.23-.pdf.
[10] Based on my review of records from the Salt Lake County Assessor's office website, CC-2 is the owner of the West Jordan Address.

his Utah home address was the Millcreek address. In support of his application, AMEZCUA submitted three documents:

      i.  A "Utah Residential Lease Agreement" listing as his landlord "Manuel Sanchez," *i.e.*, defendant SANCHEZ, and stating that he had entered a lease at the Millcreek address beginning on May 1, 2023;

      ii.  A copy of AMEZCUA's passport; and

      iii. An image of AMEZCUA's Social Security card attached to the paper on which it was mailed, listing an address in Los Angeles, California.

      d.  NAVA obtained the Nava Utah ID on or about May 24, 2023. In his application for a Utah ID, NAVA represented that his Utah home address was the Millcreek address. In support of his application, NAVA submitted three documents:

      i.  A "Utah Residential Lease Agreement" listing "Michael Sanchez" as his landlord, *i.e.*, a similar name to another Target Subject, and stated that he had entered a lease at the Millcreek address beginning on May 1, 2023;

      ii.  An image of NAVA's Social Security card; and

      iii. The first page of a J.P. Morgan Chase Bank account statement purportedly addressed to NAVA at the Millcreek Address.

    46.  Based on my review of Utah records and firearms purchase forms, I have learned, among other things, that SANCHEZ, AMEZCUA, and NAVA each obtained their Utah-issued identification cards on or

about the date of their first purchase of a firearm from a Utah-based FFL. Specifically:

      a.   SANCHEZ obtained the Sanchez Utah ID on or about November 15, 2022, with his first Utah-based FFL purchase being on or about November 16, 2022.

      b.   AMEZCUA obtained the Amezcua Utah ID on or about May 16, 2023, with his first Utah-based FFL purchase being on or about the same date.

      c.   NAVA obtained the Nava Utah ID on or about May 24, 2023, with his first Utah-based FFL purchase being on or about the same date.

      ii.  <u>SANCHEZ Did Not Live At The West Jordan Address</u>

47.  For the reasons set forth below, I believe SANCHEZ did not, in fact, live at the West Jordan Address when he claimed to live there. Furthermore, when he submitted documents to the State Utah to obtain an identification card, documents purporting to show that he lived in Utah were false.

48.  Based on my review of license-plate reader data, I have learned that SANCHEZ frequently made quick trips from California to Utah to purchase firearms. Based on my training and experience, this pattern is inconsistent with SANCHEZ purporting to be a Utah resident and purporting to live at the West Jordan Address. Two examples are described above, which involved travel on or about June 27-29, 2023, and on or about July 15-16, 2023. Other examples are described below, based on my review of LPR data and ATF Form 4473s:

a.    On or about June 12, 2023, at approximately 11:54 a.m., an LPR captured the **Sanchez Subject Vehicle** driving northbound near the California and Nevada border. On or about June 13, 2023, SANCHEZ purchased an FN model SCAR 17S rifle from FFL-1. On or about June 15, 2023, an LPR captured the **Sanchez Subject Vehicle** back in California, in the vicinity of Victorville.

b.    On or about July 10, 2023, at approximately 1:46 p.m., an LPR captured the **Sanchez Subject Vehicle** driving northbound near the California and Nevada border. On or about July 11, 2023, SANCHEZ purchased a Winchester/Browning Wildcat rifle from FFL-1. On or about July 13, 2023, an LPR captured the **Sanchez Subject Vehicle** driving southbound near the California and Nevada border.

49.   Furthermore, as set forth below, messages from Sanchez Phone 2 show that SANCHEZ was living in California and would travel to Utah for quick trips for the express purpose of purchasing firearms for resale. For example, SANCHEZ messaged with the user of the 3365 Phone about buying a pistol "next time I go out there," *i.e.*, Utah, and buying more firearms before returning "home," *i.e.*, California.

50.   Based on my review of ATF Form 4473s, Multiple Sale Reports, bank statements, and hotel records, I have learned, among other things, the following:

a.    Between in or about January 2022 and in or about July 2024, SANCHEZ booked a total of approximately 30 stays at a particular hotel in South Jordan, Utah ("Hotel-1"). In many

instances, but not all, SANCHEZ had hotel stays around the time he traveled to Utah to purchase firearms. For example:

      i.   SANCHEZ purchased a firearm on or about November 16, 2022, from FFL-1 and had a stay at Hotel-1 from on or about November 14, 2022, to on or about November 17, 2022. Based on my review of publicly available mapping information, Hotel-1 is approximately 5 minutes away from FFL-1 by car.

      ii.   SANCHEZ purchased approximately three firearms from FFL-1 on or about April 4, 2023, and he had a stay at Hotel-1 from on or about April 4, 2023, to on or about April 6, 2023.

      iii. SANCHEZ purchased a firearm from FFL-1 on or about June 13, 2023, and had a stay at Hotel-1 from on or about June 12, 2023, to on or about June 13, 2023.

      iv.  SANCHEZ purchased a firearm from FFL-1 on or about July 11, 2023, and had a stay at Hotel-1 from on or about July 11, 2023, to on or about July 13, 2023.

      b.   Based on my training and experience, this pattern is inconsistent with SANCHEZ's claim that he lives at the West Jordan Address. Based on my review of publicly available mapping information, the West Jordan Address is approximately 12 minutes away from the location of Hotel-1 by car. SANCHEZ would have little need to stay at Hotel-1 if he, in fact lived at the West Jordan Address. The frequency of his stays at Hotel-1 and the fact that many hotel stays overlap with his known firearms purchases is further confirmation that he does not, in fact, live in Utah and was

only traveling there to purchase firearms in furtherance of the Subject Offenses.

51.   Moreover, based on my training and experience, as set forth above, Utah is a source state for firearms, where firearms are more readily and more cheaply acquired, and California is a destination state for firearms where they can be resold for significant premiums.

### iii.   AMEZCUA And NAVA Did Not Live At The Millcreek Address

52.   For the reasons set forth below, I believe AMEZCUA and NAVA did not, in fact, live in Utah when they represented to FFLs that they lived in that state, namely at the Millcreek Address. Furthermore, when they submitted documents to the State of Utah to obtain identification cards, documents purporting to show that they lived in Utah were false.

53.   Based on my communications with an individual who until recently owned the duplex located at the Millcreek Address ("Owner-1"), neither AMEZCUA nor NAVA has ever lived at that address.[11] In addition, Owner-1 was shown copies of the purported leases submitted by AMEZCUA and NAVA to the State of Utah, and Owner-1 stated that he had never used that format for a lease agreement. Owner-1 further

---

[11] Based on my communication with other law enforcement officer, I know that the individual who was interviewed owned the building at the Millcreek Address throughout the relevant time period and sold the building in or about August or September 2024.

stated he has never seen or known SANCHEZ, AMEZCUA, or NAVA, and never had a Michael or Manuel SANCHEZ as a landlord, contrary to what AMEZCUA and NAVA represented on the leases they provided to Utah in obtaining state-issued identification cards.

54. Based on my review of license-plate reader data and an analysis of cellphone location data, I have learned that AMEZCUA frequently made quick trips from California to Utah to purchase firearms. Several examples are described above. Based on my training and experience, this pattern is inconsistent with AMEZCUA purporting to be a Utah resident and purporting to live at the Millcreek Address.

55. Furthermore, communications with between AMEZCUA and NAVA show that both individuals coordinated to list AMEZCUA's "brother's" address as their own when obtaining a Utah ID.

\* \* \*

56. Accordingly, based on my training and experience, I believe SANCHEZ, AMEZCUA, and NAVA did not live in Utah when they falsely stated on ATF Form 4473s that they lived in Utah and when they provided Utah-issued identification cards to complete the same firearms purchases.

F.    SANCHEZ's Purchases From The Private Sale Marketplace

57. As set forth below, records from Sanchez Phone 2 show that, between January 2023 and when the phone was seized on August 9, 2023, SANCHEZ frequently met with individuals in Utah to purchase firearms. During this period, SANCHEZ contacted approximately

eighty-one different individuals asking to see if various firearms were available and SANCHEZ offered an amount money to purchase each one. During the conversations, SANCHEZ negotiated with sellers on the price of the firearms and discussed a location of where to meet to purchase the firearms. In the communications, SANCHEZ and the sellers typically agreed to meet at locations around the Salt Lake City, Utah, area. In at least one instance, records show that SANCHEZ coordinated with the seller to purchase the firearm but it was AMEZCUA, not SANCHEZ, who met with the seller to buy the firearm. Records from Sanchez Phone 2 show that, after SANCHEZ bought the guns, he almost immediately tried to resell similar make and model firearms to other people.

58.   Based on my review of ATF records, I have learned that during the relevant period, neither SANCHEZ, AMEZCUA, nor NAVA had a federal firearms license.

59.   Several examples of SANCHEZ's purchases and resales are set forth below.

### July 13, 2023: Purchase Of A Beretta And Then
### Later Advertising The Firearm

60.   Based on my review of the Sanchez Phone 2, I have learned, among other things, the following:

a.   On or about July 12, 2023, SANCHEZ, using Sanchez Phone 2, had the following communications with an individual who was using a particular phone number ending in 4337 ("Seller-1"):

SANCHEZ:    Would you take 500 for the Beretta?

42

| | |
|---|---|
| Seller-1: | Let me think about it. I'd like to get $600 |
| SANCHEZ: | Okay let me know thank you |
| Seller-1: | You have CFP [concealed firearm permit]? |
| SANCHEZ: | No, I have my driver license and can sign a bill of sale |
| Seller-1: | Where are you located? |
| Seller-1: | I'll do $500 |
| SANCHEZ: | I stay in West Jordan |
| Seller-1: | I could meet in lehi |
| SANCHEZ: | That'll work when are you available? |
| Seller-1: | I can meet tomorrow after 5 |
| SANCHEZ: | Okay text me thank you |
| Seller-1: | 👍 |
| Seller-1: | Will you pay cash? |
| SANCHEZ: | Yes |
| Seller-1: | Sweet |

b.    After the messages above, on July 12 and 13, 2023, SANCHEZ and Seller-1 exchanged a number of messages to coordinate the sale, including locations, estimated arrival times, and details about where they would be located. Based on the messages, the meeting happened on July 13, 2023.

61.    Based on my communication with other law enforcement officers, I know that on or about October 17, 2023, agents interviewed Seller-1. Among other things, seller-1 confirmed that

43

the sale was completed and sent agents a copy of the bill of sale form that SANCHEZ completed, listing himself as the buyer, which is shown below:



62. Based on my review of the Sanchez Phone 2, I have learned, among other things, the following:

a. SANCHEZ frequently advertised selling different Beretta firearms. For example, on July 19, 2023, just six days after buying the Berreta 92X from Seller-1, SANCHEZ, using Sanchez Phone 2, had the following exchange with the user of a phone number ending in 4762 ("CC-3"):

CC-3:        What u got

CC-3:        People Guadàlajara are here

SANCHEZ:     2 berretas, a hk, a couple of Springfield
             armory, a hellcat, a taurus revolver

SANCHEZ:        9 total and im in la

. . .

CC-3:           Clear Pic of beretta

SANCHEZ:        [*Sanchez sends a photograph, but the
                phone extraction does not show the image*]

SANCHEZ:        The other one is the same but it has the
                rail on the bottom to add a light

SANCHEZ:        My boy has 3 others. I'm waiting for him
                to send pics

. . .

CC-3:           I'll take the 9

. . .

SANCHEZ:        Okay I'm in LA let me know when you're
                ready

Based on my training and experience, the conversation above reflects
SANCHEZ trying to sell a total of 9 firearms ("9 total" and listing
various types of firearms). SANCHEZ twice reiterates that he is "in
LA."

     b.    On July 20, 2023, the conversation between SANCHEZ
and CC-3 continued:

SANCHEZ:        I'll send pictures of the other two I
                have at home

CC-3:           Okay

CC-3:           Give me a total on the 11 you have n I'll
                take them all

45

Based on my training and experience, the conversation above reflects
SANCHEZ saying he has another two firearms "at home," and then
trying to sell a total of 11 firearms.

      c.   In the text message communications SANCHEZ initially
offers to sell all the firearms $9700, and then lowers his price to
$9500. SANCHEZ added "They don't have to get all of them," referring
to third party purchasers, "even if they just want four or five let
me know which ones and I'll take them."

      d.   Three days later, on July 23, 2023, SANCHEZ messaged
CC-3, saying "[o]nly 4 left," suggesting SANCHEZ had already sold
the other guns. When CC-3 asked what was still available, SANCHEZ
responded "Two barretta's, Springfield Armory XD 10 mm," and "[j]ust
those three actually $900 each." CC-3 then asked "Are the berretas
m9s," to which SANCHEZ responded "one is a 92fs and the other is a
92x." Notably, the firearm that SANCHEZ purchased from Seller-1 just
ten days earlier was a Berreta 92X.

      e.   After this exchange, SANCHEZ and CC-3 continue to
negotiate and it is not clear from the text messages whether CC-3
buys the Berreta 92X (at one point, CC-3 makes an offer for several
guns in bulk) or whether the deal falls through.

      f.   Separate from the messages above, text messages on
Sanchez Phone 2 show that SANCHEZ had an ample market for Berettas.
For example, earlier that year, on January 16, 2023, another
conspirator messaged SANCHEZ to say "Remember myboy our people out
there want barreta and glocks."

<u>July 18, 2023: SANCHEZ Coordinates A Firearm Purchase, AMEZCUA</u>

<u>Completes The Purchase, And then SANCHEZ Tries To Resell The Gun</u>

63.    Based on my review of the Sanchez Phone 2, I have learned, among other things, the following:

a.    On or about July 18, 2023, SANCHEZ, using Sanchez Phone 2, had the following communication with an individual who was using a particular phone number ending in 1471 ("Seller-2"):

| | |
|---|---|
| SANCHEZ: | Hello would you take $425 for the HK p2000 sk |
| SANCHEZ: | Thanks please let me know |
| Seller-2: | Would you be willing to go 450 |
| SANCHEZ: | Ok I can do that |
| SANCHEZ: | I have a day off today so I am free |
| . . . | |
| Seller-2: | [A]re you willing to sign a bill of sale. And how does walmart parking lot meet sound |
| SANCHEZ: | Yes |

Based on my training and experience, the conversation above reflects SANCHEZ offering $425 to buy an HK model P2000 SK pistol, and then Seller-2 and SANCHEZ agreeing to exchange the firearm for $450. They agree to meet at a particular Walmart parking lot to complete the sale.

b.    After the text message exchange above, SANCHEZ and the Seller-2 then discussed the details of meeting in person in

47

Parawon, Utah. Based on the text messages, the meeting occurred on July 18, 2024.

64. Based on my communication with other law enforcement officers, I have learned, among other things, the following:

a. On or about October 17, 2024, ATF agents interviewed Seller-2. Seller-2 confirmed that the sale occurred and sent agents a photograph of the bill of sale form. On the bill of sale form, shown below, AMEZCUA – not SANCHEZ – is listed as the purchaser of the firearm:



b.    On the bill of sale form, AMEZCUA also listed the Amezcua Phone Number as his own.

c.    Seller-2 further told agents that there was only one person there to buy the gun. Seller-2 said the person showed an ID and the ID matched the person with whom Seller-2 was dealing, *i.e.*, AMEZCUA. Seller-2 did not recall whether the buyer had a Utah ID or an out-of-state ID, but the seller believed he/she probably would not have done the sale if it was an out-of-state ID.

d.    The bill of sale notes that the firearm is a HK P2000 SK 9mm pistol with Serial No. 121-016414. Notably, this transaction occurred on the same day that AMEZCUA purchased a firearm from FFL-1 using his Utah ID, as described above.

65.    Based on my communications with another ATF analyst who has reviewed cell-site records for the Amezcua Phone Number, I have learned that cell-site records show that AMEZCUA's phone was, in fact, in Utah on the date of the transaction with Seller-2.

66.    Text messages show that SANCHEZ soon afterwards tried to sell the same gun. Specifically, based on my review of the Sanchez Phone 2, I have learned, among other things, the following:

a.    On various dates in June 2023 and July 2023, SANCHEZ had communications with the user of a particular phone number ending in 9345 ("CC-4") about SANCHEZ selling various firearms to CC-4.

b.    On or about July 19, 2023, just one day after SANCHEZ and AMEZCUA purchased the HK P2000 SK pistol from Seller-2, SANCHEZ had the following exchange with CC-4:

```
9345 Phone:  Is it the long one or short ?

SANCHEZ:     Short

9345 Phone:  Nice

. . .
```



```
SANCHEZ:

SANCHEZ:     This is the other HK I got it's smaller

             than the one your boy got
```

c.   The firearm in the photograph above has the same serial number as the one that SANCHEZ and AMEZCUA purchased from

Seller-2, Serial No. 121-016414. SANCHEZ and CC-4 did not complete the sale of the HK pistol. Based on my training and experience, the conversation above reflects SANCHEZ trying to resell the firearm he purchased from Seller-2.

d.    In addition, on July 19, 2023, SANCHEZ messaged with CC-3 about the HK firearm. As described above, on or about July 19, 2023, SANCHEZ offered to sell the user of the 4762 Phone nine, and then eleven, firearms. SANCHEZ describes one of those as an "HK 9mm." The firearm that SANCHEZ and AMEZCUA purchased several days earlier from Seller-2 was also a HK 9mm caliber pistol. Based on my training and experience, the conversation above also reflects SANCHEZ trying to resell the firearm he purchased from Seller-2.

<u>Other Examples Of SANCHEZ's Sales</u>

67.    Based on my review of Sanchez Phone 2, I know, among other things, that Sanchez Phone 2 has many examples of SANCHEZ buying and selling firearms. SANCHEZ frequently messaged various contacts with a description of firearms available and a price. The following are an example of messages sent by SANCHEZ, along with the date of the message:

a.    Glock 43x Brand new and I'll throw in a holster. 850 (December 31, 2022);

b.    Found this ak brand new with a bunch of Tactical extras. 1600 (January 16, 2023);

c.    Brand new Glock 45 9mm with 3-17 round magazines and glow in the dark sights. 900 (January 20, 2023);

51

d.   Glock 26 9mm caliber 3-10 round magazines. 850 (January 20, 2023);

e.   Glock 45 9mm. 2-10 round magazines. 850 (February 8, 2023);

f.   Hk P30 9mm 3-15 round magazines and glow in the dark sights. 850 (February 10, 2023);

g.   Sig sauer p320 9mm threaded barrel glow in the dark night sights 2-15 round magazines. 900 (February 28, 2023);

h.   FN FNS40 .40 caliber 2-13 round magazines and a holster. 900 (February 28, 2023);

i.   Springfield Armory XDS .45 caliber 3-6 round magazines. 900 (February 28, 2023);

j.   Beretta apx carry 9 mm caliber 1- 6 round magazine 1-8 round magazine. 800 (May 28, 2023);

k.   Springfield Armory XD .45 caliber 1- 10 round magazine. 850 (May 29, 2023);

l.   Sig Sauer p365 XL with Romeo zero Red Dot and 2-12 round magazines 9 mm. 950 (June 4, 2023);

m.   Smith & Wesson SD40 2 - 14 round magazines. 800 (June 14, 2023);

n.   CZ P-10S 9 mm caliber 2- 12 round magazines. 800 (June 14, 2023);

o.   SAR-USA 9X 9mm 2-17 round magazines, light, holster. 850 (June 14, 2023);

52

p.   Glock 19 9mm caliber 2-15 round magazines, holster, stippled. 900 (June 19, 2023);

q.   Bersa .380 1-15 round magazine. 750 (June 19, 2023);

r.   Kahr arms P380 2-6 round magazines 1-7 round magazine. 850 (June 19, 2023);

s.   Ruger LCP 2 .380 caliber 3-6 round magazine and Holster. 750 (June 19, 2023);

t.   Beretta 92x 9 mm caliber 2- 17 round magazines, custom aftermarket grips and original grips included, glow-in-the-dark sights. 1100 (June 19, 2023);

u.   Glock 45 MOS 9 mm caliber 2-15 round magazines Red Dot Optics ready. 950 (June 20, 2023); and

v.   Smith & Wesson M&P .40 caliber 2- 6 round magazines, 2-8 round magazine and holster. 900 (June 20, 2023).

## Evidence Of The Ongoing Scheme

68.   As set forth above, records from FFLs show SANCHEZ purchasing firearms in Utah as recently as July 2024. However, license-plate reader data and cellphone location data shows SANCHEZ traveling to Utah for short trips – a pattern of activity matching his involvement in the Subject Offenses – as recently as October 2024. Specifically, based on my review of LPR data and my communications with other law enforcement officers who have reviewed cellphone location data for the phone associated with the Sanchez Phone Number, I have learned, among other things, the following:

     a.   License-plate reader data showed the **Sanchez Subject Vehicle** traveling northbound on I-15 near the border of California and Nevada on August 22, 2024, and then traveling southbound on I-15 near the border of California and Nevada on August 23, 2024.

     b.   License-plate reader data showed the **Sanchez Subject Vehicle** traveling northbound on I-15 near the border of California and Nevada on September 29, 2024, and then traveling southbound on I-15 near the border of California and Nevada on September 30, 2024.

     c.   License-plate reader data showed the **Sanchez Subject Vehicle** traveling northbound on I-15 near the border of California and Nevada on October 12, 2024, in the vicinity of Taylorville, Utah, on or about October 13, 2024, then traveling southbound on I-15 near the border of California and Nevada later on October 13, 2024.

69. Based on my training and experience, these short trips are consistent with other trips described herein when SANCHEZ traveled to Utah to purchase firearms.

70. During the course of this investigation, I have received alerts when an FFL conducts a firearms background check on SANCHEZ, AMEZCUA, or NAVA, which is an indicator that those individuals are attempting to purchase a firearm from an FFL. I did not receive an FFL background check alert for certain short trips when the Target Subjects traveled to Utah, such as SANCHEZ's August 2024 and September 2024 trips. However, based on my training and experience, I know that when an individual purchases firearms from an informal,

online gun exchange, like the one SANCHEZ utilized, no FFL background check is performed and therefore no alert would be sent to me. For the reasons set forth above, I believe SANCHEZ has changed to generally purchasing firearms through informal, online gun exchanges, where no FFL is involved and therefore no alert is generated. I believe this is consistent with SANCHEZ's efforts to avoid detection by law enforcement, particularly after his August 2023 detention. It is also corroborated by messages found on Sanchez Phone 1 and Sanchez Phone 2 where SANCHEZ and others reference buying or selling guns on an "exchange" and reference a particular Utah-based online gun exchange.

       G.    <u>The Sanchez Subject Premises and the Sanchez Vehicle</u>

      71.    As set forth below, I believe SANCHEZ resides at both **Sanchez Subject Premises 1** and **Sanchez Subject Premises 2**, and that he drives the **Sanchez Subject Vehicle.**

      72.    Based on my communications with other law enforcement officers, I have learned that, in or about July 2023, records from the San Bernardino County Assessor's Office showed that SANCHEZ was the owner of **Sanchez Subject Premises 1.**

      73.    Based on my review of police records, I have learned that on or about February 2, 2023, SANCHEZ filed a police report with the Gardena Police Department. In the report, SANCHEZ listed **Sanchez Subject Premises-1** as his home address.

      74.    Based on my review of California DMV records, I have learned that on or about September 26, 2019, SANCHEZ applied for a

California driver's license and listed **Sanchez Subject Premises 1** as his mailing and residential address.

75.   Based on my communications with other law enforcement officers, I know that, on or about February 14, 2024, ATF agents conducted surveillance at **Sanchez Subject Premises 1**. While there, agents observed a 2010 Toyota Corolla bearing California License Plate 6JPG626 parked within the property fence (the "Toyota Corolla"). DMV records show that the Toyota Corolla was registered to SANCHEZ at **Sanchez Subject Premises 2**. On February 22, 2024, ATF agents again conducted surveillance at **Sanchez Subject Premises 1** and agents observed the same Toyota Corolla parked within the property fence.

76.   On or about October 11, 2024, the Hon. Alka Sagar, United States Magistrate Judge, United States District Court for the Central District of California, signed a warrant authorizing agents to collect historical and prospective location data for various cellphones, including historical and prospective location data for the Sanchez Phone Number. Based on my communications with an ATF analyst who has reviewed historical and prospective data for the Sanchez Phone Number, I have learned, among other things, the following:

a.   Location data shows the phone connected to the Sanchez Phone Number frequently traveling around the Southern California area, including at various locations in Los Angeles County and San Bernardino County. Location data shows the phone

56

connected to the Sanchez Phone Number frequently staying overnight in two locations. Based on my training and experience, the location where a phone stays overnight is often indicative of where an individual has their residence and, therefore, where evidence of their activity is most likely to exist.

b.   Based on location data, the first place SANCHEZ frequently stays overnight is **Sanchez Subject Premises 1**. Since on or about September 12, 2024, SANCHEZ has stayed overnight in the vicinity of **Sanchez Subject Premises 1** approximately 10 times, including as recently as October 20, 2024. The second place SANCHEZ frequently stays overnight is **Sanchez Subject Premises 2**. Since on or about September 12, 2023, SANCHEZ has stayed overnight in the vicinity of **Sanchez Subject Premises 2** approximately 24 times, including as recently as October 18, 2024. On other dates, SANCHEZ was traveling overnight or in other locations.

c.   Based on location data, in two recent weeks, SANCHEZ spent nights during the weekday in the vicinity of the **Sanchez Subject Premises 2** in Los Angeles and nights on the weekends in the vicinity of **Sanchez Subject Premises 1** in Helendale or making short trips to Utah.

d.   Moreover, location data shows SANCHEZ making stops at **Sanchez Subject Premises 1** before a short trip to Utah, and then stopping at **Sanchez Subject Premises 1** and **Sanchez Subject Premises 2** after returning from Utah. Specifically, on or about October 12, 2024, location data for the Sanchez Phone Number shows SANCHEZ at a

business location near **Sanchez Subject Premises 2** in Los Angeles, and then traveling to the vicinity of **Sanchez Subject Premises 1** in Helendale. Location data then shows SANCHEZ traveling to Utah, and then returning after a short period. On October 13, 2024, location data shows SANCHEZ traveling from Utah to the vicinity of **Sanchez Subject Premises 1** in Helendale and then to the vicinity of **Sanchez Subject Premises 2** in Los Angeles.

77.    Based on my communications with other law enforcement officers, I have learned that, on or about October 21, 2024, ATF officers were doing surveillance at the Amezcua Subject Premises. Surveillance showed that the Toyota Corolla was at the Amezcua Subject Premises. As set forth above, the Toyota Corolla is registered to SANCHEZ at **Sanchez Subject Premises 2**.[12]

78.    Based on my review of vehicle registration records, I know that another vehicle, a 2024 Kia with California License Plate 9GZB665 is leased to "Manual I Sanchez" at **Sanchez Subject Premises 2**.[13]

---

[12] Based on my review of photographs taken by law enforcement officers doing surveillance, I have learned that, when agents saw the Toyota Corolla at the **Amezcua Subject Residence,** another individual – not SANCHEZ – emerged from the vehicle. Based on my review surveillance photographs and my review of law enforcement photographs, I believe the person emerging from the vehicle at the Amezcua Subject Residence may be SANCHEZ's father. Regardless, I believe the use of the Toyota Corolla and its registration to **Sanchez Subject Premises 2** shows that SANCHEZ continues to use the premises in Los Angeles.
[13] Based on my review of law enforcement reports, I have learned that SANCHEZ's father may also be named "Manuel Ivan Sanchez." However,

79.   Other records show that SANCHEZ frequently travels to Los Angeles, where **Sanchez Subject Premises 2** is located. For example, based on my review of Sanchez Phone 2, I know that, on July 19, 2023, SANCHEZ messaged a potential buyer, saying "9 total [firearms for sale] and im in la." As another example, on or about January 15, 2023, SANCHEZ messaged a co-conspirator, saying "I'm going to be in LA tomorrow, bring the two duffel bags with you please."

80.   Based on my review of historical photographs on Apple Maps, I have learned that, in a photo of **Sanchez Subject Premises-2** taken in or about October 2018, there is a decorative sign over the entrance of the premises saying "SANCHEZ." I believe, based on my training and experience, that **Sanchez Subject Premises-2** may be a family home. However, as set forth above, recent cellphone location data shows that his phone frequently remains overnight at this premises.

81.   For the reasons set forth herein that records of criminal activity may be stored in a person's residence, I believe records of the Subject Offenses may be found in the **Sanchez Subject Premises-2**. Based on my training and experience, individuals may reside in multiple locations and keep records, even duplicate records, in each location where they reside. Moreover, electronic records are

---

whether SANCHEZ or his father is the lessee of the 2024 Kia, SANCHEZ would have access to **Sanchez Subject Premises 2**. SANCHEZ's use of the premises is further corroborated by the frequent cellphone location pings in the vicinity of **Sanchez Subject Premises 2**.

frequently synced between devices, meaning that communications to and from one device would be saved to another device belonging to the same person. Based on my training and experience, individuals often keep synced electronic devices in different premises, like a desktop/tablet/cellphone in one residence they use and a synced desktop/tablet/cellphone in another residence they use. Here, SANCHEZ has stayed frequently at both **Sanchez Subject Premises-1** and **Sanchez Subject Premises-2**. Records of his criminal activity may be found at both locations. This is particularly true given the sophistication of the scheme (involving interstate travel, co-conspirators, and multiple buyers and sellers), the cash transactions involved, the methods of concealment (involving use of false addresse and out-of-state IDs), and the length of time the Subject Offenses have been ongoing.

82.  As set forth above, the **Sanchez Subject Vehicle** is registered to SANCHEZ at the West Jordan Address. In addition, as set forth above, LPR hits to and from Utah frequently corresponded with SANCHEZ's firearms purchases in that state. In one case, AMEZCUA tried to purchase a firearm in Utah after traveling to the FFL in the **Sanchez Subject Vehicle**. Accordingly, I believe the **Sanchez Subject Vehicle** is used by SANCHEZ and may contain evidence and instrumentalities of the Subject offenses.

H.    The Amezcua Subject Premises and the Amezcua Vehicle

83.    For the reasons set forth herein, I believe AMEZCUA resides at the **Amezcua Subject Premises** and drives in the **Amezcua Subject Vehicle**.

84.    Based on my review of T-Mobile records obtained in or about October 2024, I have learned, among other things, that the Amezcua Phone Number is subscribed to "Ricardo Amezcua," and has been subscribed to that account since on or about February 8, 2022. The service and billing addresses for the Amezcua Phone Number are 8961 South Gate Ave, South Gate, California 90280, *i.e.*, the **Amezcua Subject Premises**.

85.    Based on my communication with other law enforcement officers, I know, among other things, the following:

a.    On or about March 24, 2024, agents conducting surveillance saw AMEZCUA walking into and later walking out of the **Amezcua Subject Residence**. AMEZCUA was identified by comparison to law enforcement photograph of AMEZCUA.

b.    On or about March 26, 2024, agents conducting surveillance saw the **Amezcua Subject Vehicle** parked in the driveway of **Amezcua Subject Residence**. The next day, March 27, 2024, agents saw the same thing.

c.    On or about October 21, 2024, agents conducting surveillance observed the **Amezcua Subject Vehicle** parked in the driveway of **Amezcua Subject Residence**.

86.   As set forth above, the **Amezcua Subject Vehicle** is registered to AMEZCUA and another person, and travel by the vehicle often correlated with AMEZCUA's firearms purchases in Utah.

## V.  TRAINING AND EXPERIENCE ON UNLICENSED FIREARMS DEALING AND FALSE STATEMENTS ON ATF FORMS

87.   Based on my training and experience and familiarity with investigations into unlicensed firearms dealing and false statements on ATF forms conducted by other law enforcement agents, I know the following:

a.   Unlicensed firearms dealing can take many forms and include multiple crimes, including false statements on ATF forms to acquire, transfer, and sell firearms, buying and selling in violation of federal law, trafficking to prohibited persons, transfer and concealment of criminal proceeds, and covert efforts to find new suppliers and new customers.

b.   Unlicensed firearms dealing is a business that involves numerous co-conspirators, including suppliers, intermediaries who broker guns themselves, buyers, couriers, and money launderers. Firearms dealers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, buy and sell firearms, and transport criminal proceeds.

c.   Unlicensed firearms dealers often maintain books, receipts, notes, ledgers, bank records, and other records relating

to purchasing, manufacturing, altering, transportation, and selling of firearms. The aforementioned records are often maintained where unlicensed firearms dealers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles. Unlicensed firearms dealers are particularly likely to keep records and evidence of their crimes, including firearms, ammunition, and accessories, in their residences and vehicles, as those are the places where they often store records and travel to meet with suppliers, customers, and co-conspirators.

d.    Communications between people buying, selling, and transferring firearms frequently take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cellphones and other digital devices. This includes sending photos or videos of the firearms between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in unlicensed firearms dealing to have photos and videos on their cellphones of firearms they or others working with them possess, as they frequently send these photos to each other and others to boast about the firearms or facilitate firearms sales.

e.    Unlicensed firearms dealers often keep the names, addresses, and telephone numbers of their associates on their digital devices and in their residences and vehicles. Unlicensed firearms dealers often keep records of meetings with associates,

customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

   f. Those involved in the Subject Offenses may also keep records of their false statements on ATF forms so that they can consistently use the same false statements and avoid detection. For the same reasons, they may also communicate about their false statements with co-conspirators to facilitate more fraud or to avoid detention by keeping a consistent story.

   g. Unlicensed firearms dealers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing firearms trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

   h. Unlicensed firearms dealers often keep firearms in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their firearms trafficking activities at their residence, such as firearms for sale, lists of contacts, and false identity documents. These items are often small enough to be easily hidden and thus, may be kept at a firearms dealer's residence even if the dealer lives with others who may be unaware of his criminal activity.

   i. It is common for unlicensed firearms dealers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.

These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

88.  As set forth in Attachment B, I am seeking to seize records relevant to the period from June 1, 2022, to October 23, 2024. As set forth above, SANCHEZ's first firearm purchase in furtherance of the Subject Offenses was in or about November 2022, the same month SANCHEZ obtained the Sanchez Utah ID. Based on my training and experience, firearm trafficking schemes like the one conducted by SANCHEZ, AMEZCUA, and NAVA require advance planning, expertise, time to find buyers and acquire firearms, and the development of trust between buyers, sellers, and co-conspirators. Moreover, based on my training and experience, the sophistication of the scheme – involving interstate travel, the use of fraudulently obtained IDs, and the sale of a large number of firearms – makes it likely that SANCHEZ, AMEZCUA, and NAVA were executing the scheme or preparation for the scheme before the first purchase in November 2022. As set forth above, SANCHEZ appears to be continuing the Subject Offenses and AMEZCUA has been in frequent contact with him through that period.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

89.  Based on my experience, training, and familiarity with cellphones, I am aware of the following:

a.    Cellphones frequently have telephone directory features, as well as methods to learn the call number associated with each cellphone, such as caller-identification features. Cellphones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names. Cellphone users often maintain lists, such as address books or contact information, that are stored on the cellphone or its SIM or memory card.

b.    Cellphones typically have voicemail or voice-mailbox features that allow callers to leave voice and/or alphanumeric messages if the cellphone user does not answer. Voicemail is typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphone, but may also be stored on the cellphone itself.

c.    Cellphones typically have messaging capabilities, including text, data, chat, digital photographs and video, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service) messaging and email (collectively, "text messages"), that permit the cellphones user to send and receive text messages, including messages with digital photographs and video attached. Text messages and any attachments are typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphones, but may also be stored on the cellphones itself.

66

d.    Cellphones often have electronic calendar features that allow the cellphone user to schedule appointments and meetings. Cellphones users often use that feature to remind themselves of meetings and appointments with friends and confederates.

e.    In addition to voicemail and text-messaging features, cellphones typically offer capabilities such as sending and receiving email, and accessing and downloading information from the Internet.

f.    Cellphones may have applications installed, including social media and messaging applications that permit the user to communicate with contacts using these applications.

g.    Cellphones with camera functions permit the cellphone user to take photographs and videos, which are stored on the cellphone itself.

h.    Cellphones may record location data that records where the user has carried or used the cellphone.

i.    The information described above usually remains accessible in the cellphone's memory even if the cellphone has lost all battery power and has not been used for an extended period of time.

90.    Based on my training and experience, I also know that, where electronic devices such as the Subject Device are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or years after the criminal activity occurred. This is typically true because:

67

a.    Electronic files can be stored on an electronic device for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

b.    Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on an electronic device, the data contained in the file does not actually disappear, but instead may remain on the device, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the device. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve data from an electronic device depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

c.    In the event that a user changes electronic devices, like a cellphone, the user will typically transfer files from the old device to the new device, so as not to lose data.

91.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

92.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this

70

equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

93.    The proposed search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Manuel SANCHEZ's and Ricardo AMEZCUA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SANCHEZ's and AMEZCUA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII. <u>CONCLUSION</u>

94.   For all of the reasons described above, I submit that there is probable cause to believe that SANCHEZ, AMEZCUA, and NAVA have committed violations of 18 U.S.C. § 371 (conspiracy to make false statements in records that must be kept by firearms dealers and to deal in firearms without a license).

95.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in and on the locations/vehicles persons described in Attachments A-1 through A-7.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 23rd day of
October, 2024.


THE HON. JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE